UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| CHRISTOPHER C., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 1:20-cv-01933-TAB-JRS |
| ) | |
| KILOLO KIJAKAZI, Acting Commissioner of ) | |
| Social Security Administration,[1] ) | |
| ) | |
| Defendant. ) | |

**ORDER ON PLAINTIFF'S
BRIEF IN SUPPORT OF COMPLAINT**

**I.    Introduction**

Plaintiff Christopher C. seeks judicial review of the Social Security Administration's denial of his application for disability insurance benefits. Plaintiff alleges that he is disabled because of severe lumbar spine issues. His alleged disability onset date coincides with a back surgery that he contends resulted in complications that preclude him from working. However, the Administrative Law Judge concluded that Plaintiff's condition responded well enough to treatment to allow him some gainful capacity to work. For the reasons detailed below, the Court affirms the ALJ's decision.

---

[1] According to Federal Rule of Civil Procedure 25(d), after the removal of Andrew M. Saul from his office as Commissioner of the SSA on July 9, 2021, Kilolo Kijakazi automatically became the Defendant in this case when she was named as the Acting Commissioner of the SSA.

**II.     Background**

On July 7, 2017, Plaintiff filed the instant application for disability insurance benefits, alleging a disability onset date of November 2, 2016. His application was denied initially and upon reconsideration. An ALJ conducted a hearing and on June 26, 2019, denied Plaintiff's claim. The ALJ found that Plaintiff had "the following severe impairments: degenerative disc disease and osteoarthritis." [Filing No. 11-2, at ECF p. 26 (citation omitted).] The ALJ found Plaintiff's RFC to be limited as follows:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except he can lift, carry, push, and/or pull 10 pounds occasionally and less than 10 pounds frequently; sitting as an alternate to standing for two minutes, after every 30 minutes of sitting; standing as an alternate to sitting for two minutes, after every 10 minutes of standing; walking as an alternate to sitting for two minutes, after every 20 minutes of walking; frequently balance, stoop, kneel, crouch, crawl, and climb ramps, and stairs; and never climb ladders, ropes, and scaffolds.

[Filing No. 11-2, at ECF p. 29.] Continuing with the five-step determination, the ALJ ultimately found that there were many jobs that Plaintiff could have performed in the national economy, such as a table worker, addressing clerk, and document preparer. Accordingly, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act at any time from the alleged onset date through the date of the ALJ's decision.

**III.    Discussion**

Plaintiff asserts three errors, arguing that the ALJ: (1) provided a perfunctory and inaccurate analysis of Listing 1.04(A) that also relied on his own interpretation of complex diagnostic imaging, (2) failed to submit the new imaging to expert scrutiny, which resulted in an RFC assessment that was not supported by substantial evidence, and (3) did not meet the Commissioner's burden at Step Five.

### A. Listing 1.04(A)

To meet a listing, a claimant must establish with objective medical evidence the precise criteria that is specified. *See* 20 C.F.R. § 404.1525; *Sullivan v. Zebley*, 493 U.S. 521, 530-31 (1990); *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004) ("The applicant must satisfy all of the criteria in the Listing in order to receive an award of" benefits at Step Three). In the alternative, a claimant can establish "medical equivalence" in the absence of one or more of the findings if he has other findings related to the impairment or has a combination of impairments that "are at least of equal medical significance." *See* 20 C.F.R. § 404.1526(a)-(b).

In considering whether a claimant's impairment meets or equals a listing, an ALJ must discuss the listing by name and offer more than a perfunctory analysis. *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003); *Scott v. Barnhart*, 297 F.3d 589, 595-96 (7th Cir. 2003); *Kastner v. Astrue*, 697 F.3d 642, 647-48 (7th Cir. 2012). To demonstrate that an ALJ's listing conclusion is not supported by substantial evidence, the claimant must identify evidence of record that was misstated or ignored that met or equaled the criteria. *Sims v. Barnhart*, 309 F.3d 424, 429-30 (7th Cir. 2002).

Plaintiff contends that the evidence demonstrates that each of the requirements of Listing 1.04(A) are met. The listing requires:

> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>  A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

20 C.F.R. § Pt. 404, Subpt. P, App. 1, 1.04.

3

The ALJ addressed Listing 1.04.  He explained, in part, that "the evidence of record does not demonstrate current compromise of a nerve root (including the cauda eq[u]ina) or the spinal cord[.]"  [Filing No. 11-2, at ECF p. 28.]  Plaintiff contends that the ALJ relied on his own interpretation of the most recent MRI of Plaintiff's lumbar spine without submitting the diagnostic imaging to expert scrutiny.  The Seventh Circuit has said repeatedly that "an ALJ may not play doctor and interpret new and potentially decisive medical evidence without medical scrutiny."  *McHenry v. Berryhill*, 911 F.3d 866, 871 (7th Cir. 2018) (internal citation, quotation marks, and brackets omitted).  "An ALJ may not conclude, without medical input, that a claimant's most recent MRI results are 'consistent' with the ALJ's conclusions about [his] impairments."  *Id.* at 871 (quoting *Akin v. Berryhill,* 887 F.3d 314, 317-18 (7th Cir. 2018)).

Plaintiff concedes that the most recent state agency consultant review included a relevant MRI from 2017.  However, Plaintiff asserts that an updated MRI taken in 2018, after the most recent review, is significant because it "demonstrated a return to listing level etiology in the form of compromise (deformity) of the thecal sac (cauda equina)."  [Filing No. 15, at ECF p. 22.]  In *Moreno v. Berryhill*, 882 F.3d 722, 724-29 (7th Cir. 2018), *as amended on reh'g* (Apr. 13, 2018) (citing *Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016); *Goins*, 764 F.3d at 680), the Seventh Circuit explained that "[a]n ALJ should not rely on an outdated assessment if later evidence containing new, significant medical diagnoses reasonably could have changed the reviewing physician's opinion."  The issue is whether the imaging "changed the picture so much that the ALJ erred by continuing to rely on an outdated assessment by a non-examining physician and by evaluating himself the significance of [the evidence]."  *Stage*, 812 F.3d at 1125.

Plaintiff is mistaken about the significance of the most recent MRI.  On November 21, 2017, medical consultant M. Brill, M.D., reviewed the record, specifically considered Listing

4

1.04, and assessed limitations resulting from Plaintiff's physical impairments. [Filing No. 11-3, at ECF p. 15-17.] The evidence included treatment records from one of Plaintiff's providers, Goodman Campbell Brain & Spine. [Filing No. 11-3, at p. 13.] The provider's records included an MRI of Plaintiff's lumbar spine taken on May 31, 2017. [Filing No. 11-7, at ECF p. 148-49.]

The pertinent findings of the interpreting radiologist were that "[t]he nerve roots of the cauda equina [were] normal in appearance;" at L4-5, a "mild disc bulge flatten[ed] the ventral thecal sac," there was evidence of the recent surgery with "granulation tissue in the right ventral epidural space abutting the traversing right L5 nerve root," but the spinal canal and bilateral foramen were not narrowed; at L3-4, there was similar finding with a disc bulge contacting the thecal sac, but no narrowing of the central canal or foramen; at L2-3, "[a] mild disc bulge [was] present with a superimposed shallow central/left paracentral disc extrusion *with slight caudal migration*," that did "not affect the exiting or the traversing nerve roots," the spinal canal was "mildly narrowed," but neither foramen was narrowed; at L1-2, "[a] mild disc bulge [was] present with a superimposed shallow right paracentral protrusion and annular tear," that did "not affect the exiting or the traversing nerve roots," without any narrowing. [Filing No. 11-7, at ECF p. 148-49 (emphasis added).] The radiologist's conclusions were evidence of an "[i]interval right L4 hemilaminotomy and discectomy with epidural granulation tissue abutting the traversing right L5 nerve root," no evidence of recurrent disc herniation, a stable disc extrusion at L2-3 "without [i]mpingement," and a stable protrusion and annular tear at L1-2 "without [i]mpingement." [Filing No. 11-7, at ECF p. 149.]

On November 26, 2018, an MRI was taken of Plaintiff's lumbar spine that the interpreting radiologist compared with the MRI taken on May 31, 2017. [Filing No. 11-7, at ECF p. 209.] The pertinent findings were, at L4-5, a facetectomy defect related to the prior

discectomy with a "[m]ild enhancing granulation scar along the right ventral lateral epidural space extending towards" the defect, a [m]ild disc bulge without recurrent herniation or descending L5 impingement," and "no exiting impingement" such that the "[f]indings appear similar" to the comparison study; at L3-4, no new herniation, descending impingement, or exiting impingement; at L2-3, an "[a]nnular bulge with [a] small left paracentral disc extrusion [that] appear[ed] diminished" as compared to the prior study and resulted in "[m]ild thecal sac deformity without canal compromise or descending impingement" and no "foraminal compromise;" at L1-2, "[s]table disc morphology" with a small disc extrusion resulting in "[m]ild thecal sac deformity without descending [i]mpingement," such that "[f]indings [were] stable from prior MRI." [Filing No. 11-7, at ECF p. 209-10.]

Plaintiff contends that because the radiologist described a mild thecal sac deformity at L2-3 and L1-2 and that specific language was not included in the prior interpretation of the comparison study, it represents a new finding. The 2017 study also included findings that the bulge and extrusion at those levels resulted in caudal migration. It is unclear whether the 2018 MRI represents a new finding and diagnosis or just different language to describe the same issue. The radiologist was clear that the relevant etiology was less pronounced when compared to the prior study. Moreover, the radiologist explicitly concluded that the findings were "stable" concerning all relevant levels, L4-5, L2-3, and L1-2, without new herniation or evidence of impingement. [Filing No. 11-7, at ECF p. 210.]

The ALJ was able to rely on the radiologist's conclusions without resorting to playing doctor. An ALJ may also properly rely on an outdated assessment when "MRI evidence post-dating the state agency consultant's report show[s] only mild changes in the claimants' respective conditions." *Kemplen v. Saul*, 844 F. App'x 883, 887 (7th Cir. 2021), *as amended on reh'g in*

6

*part* (June 21, 2021) (collecting cases) (citing *Keys v. Berryhill*, 679 F. App'x 477 (7th Cir. 2017); *Olsen v. Colvin*, 551 F. App'x 868 (7th Cir. 2014)). The radiologist's interpretation is substantial evidence that the imaging had not significantly changed since Dr. Brill's review.

The radiologist's interpretation also supports the ALJ's finding that the diagnostic criteria of the listing was not met. Under the regulation:

> *Disorders of the spine*, listed in 1.04, result in limitations because of distortion of the bony and ligamentous architecture of the spine and associated impingement on nerve roots (including the cauda equina) or spinal cord. Such impingement on nerve tissue may result from a herniated nucleus pulposus, spinal stenosis, arachnoiditis, or other miscellaneous conditions.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, 1.00(K) (emphasis in original). Both MRIs explicitly described deformity of the thecal sac—at different levels—but no resulting impingement of the nerve roots or spinal cord. Plaintiff presents evidence describing the anatomy of the thecal sac – a tube of dura matter that surrounds the spinal cord and cauda equina and contains cerebrospinal fluid to provide nutrients and buoyancy as a buffer to the spinal cord and nerve roots that are both contained within and exit out of the sac. [Filing No. 15, at ECF p. 17.] Plaintiff does not demonstrate that deformity of the thecal sac necessarily means that there is impingement of the nerve roots or spinal cord. "As other courts have noted, the two ailments—deformity of the thecal sac and nerve root compression—are not one in the same." *Hamilton v. Colvin*, 2014 WL 2945799, at *3 (W.D.N.Y. June 30, 2014) (quoting *McKenna v. Apfel*, 246 F.3d 675 (9th Cir. 2000) 2000 WL 1728088, at *2 (summarizing medical experts' testimony that "there was no indication of nerve compression . . . [claimant] had only a mild disc bulging and deformity of the thecal sac.")). The 2018 MRI does not demonstrate listing-level severity.

Regarding the remaining requirements of the listing, the ALJ also explained:

> Physical examinations noted tenderness and reduced range of motion with occasional antalgic gait. The claimant is able to walk on heels and toes; has

> negative straight leg raising, Fadir sign, and Faber sign; stable station; and normal strength and sensation. In addition, radiology reports show findings to be primarily mild and stable.

[Filing No. 11-2, at ECF p. 29.] Plaintiff contends that the ALJ was consistently inaccurate in concluding that these clinical findings were not demonstrated by the record. The ALJ's summary is not completely accurate. For example, on January 29, 2018, an examination showed that Plaintiff's sensation was decreased to light touch in the right lower extremity and straight leg raising tests were positive in producing pain (but at what degree was not recorded). [Filing No. 11-7, at ECF p. 167.] Though gait was normal, a Faber sign was negative bilaterally, and muscle strength testing was normal in both lower extremities. [Filing No. 11-7, at ECF p. 167-68.]

However, Plaintiff has not demonstrated that each of the clinical requirements of the listing were met. Plaintiff relies on evidence of "motor loss demonstrated by antalgic gait and lower extremity weakness." [Filing No. 15, at ECF p. 18.] Motor loss must be demonstrated by evidence of muscle weakness. Plaintiff cites evidence from October 2016 that he had decreased muscle strength 4/5 in his right knee. [Filing No. 11-7, at ECF p. 265; Filing No. 11-7, at ECF p. 269.] However, that was prior to his alleged onset date that, more importantly, coincides with the date that he had back surgery. [*See* Filing No. 11-7, at ECF p. 280-81 (surgery on November 2, 2016).] Following his back surgery, on August 17, 2017, his gait was "slightly antalgic, full weight bearing, no assistive device, able to heel and toe walk." [Filing No. 11-7, at ECF p. 102.] The regulation explains that an "[i]nability to walk on the heels or toes, to squat, or to arise from a squatting position, when appropriate, may be considered evidence of significant motor loss." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 1.00(E)(1). Though muscle weakness must be documented "generally based on a grading system of 0 to 5, with 0 being complete loss of strength and 5 being maximum strength." *Id.*

Plaintiff has not developed that evidence of an antalgic gait, alone, can demonstrate muscle weakness to satisfy the listing, nor has he presented any legal authority for this proposition. For instance, on August 17, 2017, formal testing recorded 5/5 strength in all tested muscles in Plaintiff's lower extremities. [Filing No. 11-7, at ECF p. 102.] Plaintiff's remaining cited example of an examination showing an antalgic gait also corresponded with findings of full muscle strength. [Filing No. 11-7, at ECF p. 107 (August 2, 2017).] Plaintiff has not demonstrated that he had decreased muscle strength or that he satisfied the motor loss requirement of Listing 1.04(A) after his surgical intervention.

Plaintiff also contends that he medically equaled Listing 1.04(A) due to his severe osteoarthritis of his right knee. There is evidence that Plaintiff has a history of arthroscopic surgery on his right knee. [*See* Filing No. 11-7, at ECF p. 166.] However, Plaintiff has not demonstrated that this was a new diagnosis that post-dated Dr. Brill's review, nor has he demonstrated that the objective indications of the severity of his impairments materially changed since Dr. Brill's review. In the absence of a contradictory medical opinion, the ALJ can rely on a reviewing consultant's opinion that no listing was met or equaled even without articulating such reliance in the decision; the completion of disability transmittal forms and an RFC assessment by a state agency consultant allows the presumption that the existing record did not demonstrate that a listing was met or equaled. *Scheck v. Barnhart*, 357 F.3d 697, 700-01 (7th Cir. 2004) (citing *Steward v. Bowen*, 858 F.2d 1295, 1299 (7th Cir. 1988)). As noted above, Dr. Brill specifically considered Listing 1.04. Dr. Brill also explicitly considered evidence of a "slightly antalgic gait" when he assessed Plaintiff's functional capacity. [Filing No. 11-3, at ECF p. 17.] The ALJ's listing conclusions are supported by Dr. Brill's opinion. Accordingly, Plaintiff has not demonstrated reversable error based on the ALJ's consideration of the listings.

### B. RFC

Plaintiff also contends that the ALJ's RFC assessment was not supported by substantial evidence because he relied on the outdated assessment of Dr. Brill and failed to subject new medical imagining to expert scrutiny.  The ALJ assessed Plaintiff's RFC to be limited to a range of sedentary exertional work, rather that completely relying on Dr. Brill's assessment that Plaintiff was capable of a range of light exertional work.  [*See* Filing No. 11-2, at ECF p. 32.] The Seventh Circuit has explained that "[w]hen no doctor's opinion indicates greater limitations than those found by the ALJ, there is no error." *Dudley v. Berryhill*, 773 F. App'x 838, 843 (7th Cir. 2019) (citing *Rice*, 384 F.3d at 370).  There is no medical opinion that assessed greater limitations than the ALJ found.

Moreover, when comparing Plaintiff's May 2017 MRI to his November 2018 MRI, as noted above, there is no basis to conclude that the state agency medical consultants' findings were outdated or that their conclusions would have changed if they had reviewed the 2018 MRI. See, e.g., Natasha M. v. Saul, No. 2:19-cv-252, 2020 WL 5640529, at *7 (S.D. Ind. Sept. 2, 2020) ("[T]he Court does not find any developed reason to conclude that the consultant psychological assessments were critically outdated relative to the completed record.").  Even if the ALJ had relied on Dr. Brill's opinion to assess Plaintiff's RFC, Plaintiff has not demonstrated that there was any objective evidence that his conditions had worsened.  Accordingly, the ALJ's RFC assessment does not support remand.

### C. Step Five

Lastly, Plaintiff contends that the ALJ's Step Five determination is not supported by substantial evidence because the ALJ never put to the vocational expert a hypothetical question that described limitations that matched those that were ultimately assessed to encompass

Plaintiff's RFC.  When a claimant is incapable of the full range of an exertional level, the ALJ must rely on "reasonable evidence" and "[a] vocational expert may be used by the [Commissioner] to assess whether there are a significant number of jobs in the national economy that the claimant can do."  *Lee v. Sullivan*, 988 F.2d 789, 793 (7th Cir. 1993) (citing *Warmoth v. Bowen*, 798 F.2d 1109, 1112 (7th Cir. 1986) (per curiam); 20 C.F.R. § 404.1566(e)).  The Seventh Circuit has explained generally that "[t]he hypothetical question posed by the ALJ was proper [when] it reflected [Plaintiff's] impairments to the extent that the ALJ found them supported by evidence in the record."  *Ehrhart v. Sec'y of Health & Hum. Servs.*, 969 F.2d 534, 540 (7th Cir. 1992).

      The language used to describe Plaintiff's RFC regarding a sit/stand option does not perfectly match the language the ALJ put to the VE.  The ALJ explained to the VE:

> I would ask you to take that same hypothetical, but we're go[ing to] add what is commonly referred to as a sit/stand option.  And what I mean by that is that the individual would need to have the opportunity to stand for two minutes after every 30 minutes of sitting, or sit for two minutes after every ten minutes of standing or 20 minutes of walking.

[Filing No. 11-2, at ECF p. 63.]  The ALJ used arguably more confusing language in the relevant portion of the RFC finding.  In the ALJ's decision, the ALJ described the sit/stand option "as sitting as an alternate to standing for two minutes, after every 30 minutes of sitting; standing as an alternate to sitting for two minutes, after every 10 minutes of standing; walking as an alternate to sitting for two minutes, after every 20 minutes of walking."  [Filing No. 11-2, at ECF p. 29.]

      Despite awkward phrasing that begins each clause with an exertional function (for example, "walking as an"), followed by an ambiguous "alternate to," the Court does not conclude that the alternate expressions have different meanings.  The Court views that entire clause "walking as an alternate to sitting for two minutes, after every 20 minutes of walking" as

11

meaning that Plaintiff must have the option to sit for two minutes after every 20 minutes of walking.  That is consistent with the hypothetical that was put to the VE.  If each clause beginning with "sitting as," "standing as," and "walking as" respectively is understood the same way, the entire description of the sit/stand option is completely consistent with what was conveyed to the VE.

Plaintiff contends that the final clause "walking as an alternate to sitting for two minutes, after every 20 minutes of walking" means that he must be able to walk around for two minutes after sitting, which would be problematic concerning his ability to stay at the workstation and stay on task.  [Filing No. 15, at ECF p. 24-25.]  In addition, Plaintiff claims that the RFC description included typographical errors, for example, using "walking" when the ALJ meant "sitting."  However, the Court disagrees.  If the final clause is interpreted as Plaintiff contends, there would be no indication how long Plaintiff could sit before needing to walk for two minutes.  That is unless you assume, as Plaintiff does, that the end of the clause, "after every 20 minutes of walking" really meant after 20 minutes of sitting.  Though the RFC description is not a model of clarity, the Court does not conclude that final clause refers to the need to walk after sitting.  To the extent that the RFC description may contain grammatical errors or ambiguous and awkward phrasing, those errors are harmless considering the clearer language put to the VE.

## IV.     Conclusion

For the reasons explained above, Plaintiff failed to demonstrate reversable legal error or that the ALJ's findings were unsupported by substantial evidence. Therefore, Plaintiff's request for remand for an award of benefits or further proceedings [Filing No. 15] is denied. The Commissioner's decision is affirmed.

Date: 10/13/2021

_____

Tim A. Baker
United States Magistrate Judge
Southern District of Indiana

Distribution: All ECF-registered counsel of record by email.